| | | |
|---|---|---|
| **Summons** | CIVIL DOCKET NO.<br>2083 CV 00401 | **Trial Court of Massachusetts**<br>**The Superior Court** |

| CASE NAME: | | Robert S. Creedon, Jr. | Clerk of Courts |
|---|---|---|---|
| **L.S.**  Gordon C. Andrews<br><br>*Plaintiff(s)*<br><br>vs.<br><br>The Town of Halifax, et al<br><br>*Defendant(s)* | | Plymouth | County |
| | | COURT NAME & ADDRESS: | |
| | | Plymouth Superior Court | |
| | | 72 Belmont Street | |
| | | Brockton, MA 02301 | |

THIS SUMMONS IS DIRECTED TO  The Town of Halifax
Planning Board
_____  (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the  Plymouth Superior  Court.
**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.**

To respond to this lawsuit, you must file a written to response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:
   a) Filing your **signed original** response with the Clerk's Office for Civil Business, Plymouth Superior  Court
   52 Obery Street, #2041, Plymouth, MA 02360 (address), by mail or in person **AND**
   b) Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address:
   Ginny Kremer, ESQ.
   Blatman, Bobrowski & Haverty, LLC
   9 Damonmill Square, Suite 4A4
   Concord, MA 01742

3. **What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your court no more than 10 days after sending your Answer.

A TRUE COPY, ATTEST

8/14/20

DEPUTY SHERIFF

| Summons | CIVIL DOCKET NO.  2083 CV 00401 | Trial Court of Massachusetts  The Superior Court |
|---|---|---|

| CASE NAME:  (L.S.)  Gordon C. Andrews                    Plaintiff(s)  vs.  The Town of Halifax , et al                    Defendant(s) | Robert S. Creedon, Jr.                    Clerk of Courts  Plymouth                                        County |
|---|---|
| | COURT NAME & ADDRESS:  Plymouth Superior Court  72 Belmont Street  Brockton, MA 02301 |

THIS SUMMONS IS DIRECTED TO  __The Town of Halifaxc__
__Board of Selectmen__ _____ (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the Plymouth Superior    Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.**

To respond to this lawsuit, you must file a written to response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

   a) Filing your **signed original** response with the Clerk's Office for Civil Business, Plymouth Superior  Court
   52 Obery Street, #2041, Plymouth, MA 02360 (address), by mail or in person **AND**

   b) Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address:
   Ginny Kremer

   Steinem, Bobrowski & Haverty, LLC
   9 Damonmill Square, Suite 4A4
   Concord, MA 01742

3. **What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your court no more than 10 days after sending your Answer.

A TRUE COPY, ATTEST

8/14/20

DEPUTY SHERIFF

| **Summons** | CIVIL DOCKET NO.

2083 CV 00401 | **Trial Court of Massachusetts**

**The Superior Court** |

CASE NAME:

(L.S.)

Gordon C. Andrews

*Plaintiff(s)*

vs.

The Town of Halifax, et al

*Defendant(s)*

| Robert S. Creedon, Jr. | Clerk of Courts |
| Plymouth | County |

COURT NAME & ADDRESS:

Plymouth Superior Court

72 Belmont Street

Brockton, MA 02301

THIS SUMMONS IS DIRECTED TO  The Town of Halifax
Zoning Board of Appeals   (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the  Plymouth Superior  Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.**

To respond to this lawsuit, you must file a written to response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

    a) Filing your **signed original** response with the Clerk's Office for Civil Business, Plymouth Superior  Court

    52 Obery Street #2041, Plymouth, MA 02360 (address), by mail or in person **AND**

    b) Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address:

    Ginny Kremer, Esq.     Blatman, Bobrowski & Haverty, LLC
9 Damonmill Square, Suite 4A4
Concord, MA 01742

3. **What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your court no more than 10 days after sending your Answer.

A TRUE COPY, ATTEST

8/14/20

DEPUTY SHERIFF

## COMMONWEALTH OF MASSACHUSETTS

Plymouth, ss.

SUPERIOR COURT
NO. 2083CV00401

GORDON C. ANDREWS,

Plaintiff,

v.

The Town of Halifax through its Board of
Selectmen, Zoning Board of Appeals and
Planning Board; and Thomas Millias, Robert
Piccirilli, Kozhaya Nessralla, and Charles
Seelig, in their Individual and Official
Capacities as Officials of the Town of Halifax,

Defendants.

## FIRST AMENDED COMPLAINT AND JURY DEMAND

### THE PARTIES

1. The Plaintiff, Gordon Cunningham Andrews (Mr. Andrews), is an adult resident of the
   Town of Halifax, Plymouth County, Massachusetts, with an address of 244 Elm Street.

2. Defendant, Town of Halifax, ("the Town"), is a municipal corporation organized under
   the laws of the Commonwealth with its principal office located at 499 Plymouth Street,
   Halifax MA 02338; the Halifax Board of Selectmen, Zoning Board of Appeals, and
   Planning Board are all duly constituted Boards of the Town with the same principal
   address.

3. The Defendant, Thomas Millias, (Mr. Tom Millias), is an adult resident of the Town of
   Halifax, with a street address of 357 South Street, Halifax, Plymouth County,
   Massachusetts.

4. Defendant Tom Millias has at all relevant times been an elected member of the Town of
   Halifax's Board of Selectmen ("the Board").

5.  The Defendant, Robert Piccirilli, (Mr. Piccirilli) is an adult resident of the Town of Halifax, with a street address of 20 Paradise Lane, Halifax, Plymouth County, Massachusetts.

6.  Defendant, Piccirilli is currently the appointed Building Commissioner for the Town of Halifax, and formerly served as a member of the Halifax Planning Board ("Planning Board")

7.  The Defendant, Kozhaya Nessralla, (Mr. Nessralla) is an adult resident of the Town of Halifax, with a street address of 69 Summit Street, Halifax, Plymouth County, Massachusetts.

8.  Defendant Nessralla has at all relevant times been a member of the Halifax Zoning Board of Appeals ("ZBA").

9.  The Defendant, Charles Seelig, is an adult resident of 12 Firglade Ave, Providence, Rhode Island.

10. The Defendant Charles Seelig has at all relevant times been the appointed Town Administrator of the Town of Halifax.

## JURISDICTION AND VENUE

11. Venue is appropriate in this Court under G.L. c. 223, §§1 and 8(3) as activities in question are within this judicial district and the conduct giving rise to this action took place within this judicial district.

12. Jurisdiction is appropriate in this Court under G.L. c. 212 §4.

## FACTUAL ALLEGATIONS

13. The current members of the Halifax Board of Selectmen as of August 1, 2020 are, Mr. Troy Garron, Mr. Thomas Millias, and Mr. Gordon C Andrews.

14. Ms. Kim Roy was a member of the Board of Selectmen until May 18, 2020.

15. The current members of the Halifax Zoning Board of Appeals as of August 1, 2020 are Robert Gaynor, Defendant Nessralla, Gerald Joy, Peter Parcellin, and Robert Durgin; the current alternate member is Daniel Borsari.

16. The current members of the Halifax Planning Board as of August 1, 2020 are Gordon R. Andrews, Mark Millias, Alan Dias, Richard Merry, and Amy Troup.

17. Defendant Millias was the Building Inspector from 1997 until 2015.

18. Defendant Piccirilli was the assistant Building Inspector from 1999 to 2015.

19. Defendant Piccirilli became the Building Inspector in 2015.

20. On February 21, 2003, Plaintiff Andrews purchased 244 Elm Street, Halifax, where he resides with his wife and young daughter in a single family home.

21. The land immediately abutting 244 Elm Street is identified on the Halifax Assessors' Map 15 as Lots 13 and 5, and Map 14, Lot 9 ("the Site").

22. At the time he purchased his home, the Site was undeveloped and in a natural vegetated state.

23. The Site was owned by the Bosworth family.

24. When Mr. Andrews purchased his home, he was aware that there had been previous attempts to develop the Site.

25. The Site comprises approximately 12 acres of predominately back land and has only a thin strip connecting it to Elm Street.

26. The Site has only 74.75 feet of frontage on Elm Street and no frontage on any other street or way.

27. Each time the Bosworth family or a prospective buyer inquired about developing the Site, the Town through the Planning Board or other official responded that the Zoning By Law ("ZBL") required 110 ft. of frontage on an existing way for any new subdivision.

28. At that time it was the Town's position that the Site could only be developed as a single-family home under the Estate Lot provisions of the ZBL, § 167-16.

29. On January 14, 2005, Mr. Corrie S. Merritt, trustee of the Party Trust ("the Trust"), purchased the Site from the Bosworth family for $250,000.

30. Mr. Merritt represented to the Bosworths that he would build only a single-family home for himself on the Site and would not attempt any larger development.

31. In 2006, however, the Trust proposed to construct a 48-unit multifamily development on the Site pursuant to G.L. c. 40B.

32. On or about October 10, 2006, the Halifax Board of Selectmen ("the Board") held a public hearing on the Trust's 40B proposal.

33. The Trust later withdrew its 40B proposal.

34. On or about October 28, 2010, the Trust submitted plans to the Planning Board depicting a conventional subdivision on the Site.

35. The Trust later withdrew that proposal.

36. In 2012, the Trust again submitted plans to the Planning Board depicting a conventional subdivision on the Site named "Amanda's Estates."

37. The Trust later withdrew that proposal.

38. On May 8, 2014, the Trust submitted a site plan to the Planning Board proposing a multifamily development, also known as Amanda's Estates, on the Site.

39. The proposed site plan described in the preceding paragraph depicted the Site as a single 12+ acre lot with all proposed residential buildings located thereon.

40. At a Planning Board meeting during which the Trust's proposal was discussed, another developer, Halifax Trails, LLC ("Halifax Trails") presented its proposal to construct a multifamily development on land located off of Monponsett Street in Halifax.

41. At that meeting, Halifax Trails acknowledged that the ZBL required that each building in a multifamily development be located on an individual lot with continuous frontage on a public or private way.  ZBL 167-17.D(2)(a).

42. At that meeting, Halifax Trails represented to the Planning Board that it would require frontage variances for at least some of the lots it was proposing to create to locate each building in its multifamily development.

43. On June 19, 2014, the Planning Board discussed both the multifamily developments proposed by the Trust and by Halifax Trails.

44. Present at that meeting were Debra Tinkam and Robert Gaynor, then members of the ZBA.

45. Town Administrator Charles Seelig and Town Land Use Counsel Richard Hucksam opined in writing that the requirement of 167-7.D(2)(a) that each building in a multifamily development be located on an individual lot required rejection of any plan that did not depict each proposed building on an individual lot.

46. The Trust thereafter caused its proposed site plan to be revised.

47. The Trust's new proposed site plan depicted six duplexes, each sited on an individual "lot" with continuous frontage on a proposed way called "Amanda's Way."

48. The Planning Board approved the Trust's site plan as revised.

49. Defendant Piccirilli was a member of the Planning Board and signed the site plan approval letter on behalf of the Board.

50. In addition to site plan approval, the ZBL required a special permit from the ZBA to allow the use of real property for multi-family residential.

51. The Trust's special permit application filed with the ZBA referred to the same plan set that the Planning Board had approved, which depicted each proposed duplex on an individual "lot" with frontage on a proposed way, "Amanda's Way."

52. The ZBA issued its special permit in 2015 based on those plans "the Approved Plans").

53. The ZBL required 110 feet of frontage to construct a new way to serve any new lots.

54. The Site, however, had only approximately 74 feet of frontage.

55. After the Planning Board and the ZBA issued approvals based on the Approved Plans, the Trust again caused its plans to be revised.

56. The revised plans depicted what were previously labeled "lots" as "phases," and the lot lines were removed and replaced with dashed lines ("Revised Plans").

57. The principals of the Trust had actual knowledge that any revisions to its Approved Plans were required to be submitted to the Planning Board and the ZBA for further review and approval.

58. The Trust did not submit its revised plans to the Planning Board or the ZBA.

59. The Trust submitted its Revised Plans to Defendant Piccirilli, who had by then been appointed Building Inspector.

60. The Trust submitted the Revised Plans to Defendant Piccirilli in connection with its application for building permits for two of the proposed duplexes.

61. Mr. Piccirilli had been a member of the Planning Board when it issued its site plan approval in 2014 based on the Approved Plans.

62. Mr. Piccirilli had actual knowledge that the Approved Plans depicted each proposed duplex on individual lots with frontage on the proposed new way.

63. Mr. Piccirilli had actual knowledge that a majority of the Planning Board issued site plan approval with the understanding that the Trust would create the lots and private way that its Approved Plans depicted via subdivision pursuant to the Subdivision Control Act.

64. Mr. Piccirilli had actual knowledge that the Trust would require frontage variances from the ZBA in order to create the lots that its Approved Plans depicted.

65. Mr. Piccirilli had actual knowledge that the Site did not meet the ZBL's frontage requirements for the creation of the private way its Approved Plans depicted.

66. Mr. Piccirilli had actual knowledge that the Trust did not submit its Revised Plans to the Planning Board or the ZBA as required by the ZBL.

67. Mr. Piccirilli had actual knowledge that the Revised Plans had been altered to remove the lot lines because the "lots" depicted in the Approved Plans because the Trust had not created the lots.

68. Mr. Piccirilli "interpreted" the requirement of the ZBL that each building in a multifamily development "be located on an individual lot with continuous frontage on a public or private way," ZBL 167-7.D(2)(a) to not require each building in the Trust's multifamily development to be locate on an individual lot with continuous frontage on a public or private way.

69. Mr. Piccirilli's "interpretation" was that the word "lot" as used in ZBL 167-7.D(2)(a) did not mean "lot" as that term is defined in the ZBL or understood as a matter of Massachusetts land use law.

70. Mr. Piccirilli's "interpretation" was that the requirement that each "lot" have "continuous frontage on a public or private way" as stated in ZBL 167-7.D(2)(a) did not require the Trust to create the "private way" its Approved Plans depicted by any manner recognized by Massachusetts land use law.

71. Rather, Mr. Piccirilli "interpreted" the ZBL to allow the Trust begin construction despite the fact that it had not created the lots or way depicted in its approved plans.

72. Mr. Piccirilli had personal financial reasons to "interpret" the ZBL to not require the creation of lots or ways for multi-family developments.

73. Specifically, Mr. Piccirilli and his business partner, Defendant Tom Millias ("the Partners") are local real estate developers.

74. The ZBL requirements that each building in a multifamily development "be located on an individual lot with continuous frontage on a public or private way," ZBL 167-7.D(2)(a), prevents the development of lucrative multifamily projects on parcels of property that do not have at least 110 feet of frontage on a way.

75. The ZBL requirements that each building in a multifamily development "be located on an individual lot with continuous frontage on a public or private way," ZBL 167-7.D(2)(a), imposes controls on the number of lots that can be created because each lot must meet frontage requirements.

76. "Interpreting" the ZBL to allow multifamily developments to be sited on parcels that lack a minimum of 110 feet of frontage removes a major impediment lucrative multifamily development.

77. "Interpreting" the ZBL to allow "lots" in multifamily developments that lack the frontage required by the ZBL allows for denser developments, increasing the profitability to the developer.

78. Additionally, Defendant Partners Piccirilli and Tom Millias own a rental property comprised of two buildings on a single parcel.

79. The parcel referred to in the preceding paragraph does not meet the ZBL's requirement that each building in a multifamily development be located on an individual lot with continuous frontage on a public or private way.

80. The parcel described in the preceding paragraphs lacks the minimum area and frontage that would be required to subdivide the property into two individual lots.

81. Despite his actual knowledge that the Trust had not created the individual lots and private way depicted on its Approved Plans, Mr. Piccirilli approved the two building permit applications allowing the Trust to begin construction of two duplexes on the Site.

82. Mr. Piccirilli took the action described in the preceding paragraph in furtherance of his own financial interests as a Developer and owner of rental property, and to reward the Trust as a connected developer.

83. Because the Trust had not complied with its Approved Plans by creating the lots and the proposed way those plans depicted, Mr. Andrews appealed the issuance of the building permits to the ZBA.

84. Mr. Andrews also sought enforcement of the ZBL's requirements that each building in a multifamily development be located on an individual lot with adequate frontage on a public or private way, ZBL 167-7.D(2)(a).

85. At the ZBA hearing on Mr. Andrews' petitions for relief, ZBA counsel attorney Hucksam advised the ZBA that Mr. Andrews was correct and the ZBA should revoke the building permits.

86. The ZBA, acting against the legal advice of its own counsel, denied Mr. Andrews' petitions and upheld Mr. Piccirilli's issuance of the building permits.

87. The ZBA's written decision provided no justification for upholding the issuance of the building permits despite the fact that the Trust had not complied with its Approved Plans by creating the lots and the private way depicted thereon.

88. The ZBA's written decision provided no justification for its denial of Mr. Andrews' request for enforcement of the ZBL's requirement that each building in a multifamily development be located on an individual lot with adequate frontage on a public or private way, ZBL 167-7.D(2)(a).

89. ZBA member Defendant Nessralla denied Mr. Andrews' petitions in bad faith, based on his own personal financial interests, business relationships with the Trust's principals and associates, and/or personal animus against Mr. Andrews.

90. Other ZBA members were also motivated by personal financial interests, business relationships with the Trust's principals and associates, and/or personal animus against Mr. Andrews in casting their votes against the advice of their counsel.

91. ZBA counsel, attorney Hucksam, advised the Trust at the public hearing that construction could not continue while the building permits were under appeal.

92. The Trust's counsel responded that the Trust would decide whether or not to continue construction as a "business decision."

93. Mr. Andrews was forced to appeal the ZBA's decision by filing a civil action against the ZBA under G.L. c. 40A, section 17.

94. Mr. Piccirilli complained to members of the Board about attorney Hucksam because attorney Hucksam would not accept Mr. Piccirilli's baseless "interpretation" of the ZBL.

95. The Board thereafter interviewed attorneys.

96. During the interview process Board member Roy stated that the Town offered training for Board members regarding the state conflict of interest law, but did not require board members to complete the training.

97. Board members Roy and Garron acknowledged that some Halifax board and committee members serve on boards for their own ulterior motives.

98. The Board thereafter fired attorney Hucksam and replaced him with attorney Kim Salliant, an attorney who indicated willingness to defend the ZBA's baseless decision.

99. Board member Defendant Tom Millias voted to replace attorney Hucksam in bad faith, based not on the Town's best interests, but instead based on his own financial interests,

his business relationships with the Trust's principals, and/or his personal animus against Mr. Andrews.

100. On March 27, 2018, Town Administrator Defendant Seelig advised the Board that it should seek Town Meeting approval for the deletion of ZBL section 167-7.D(2)(a) that requires each building in a multifamily development be located on an individual lot with continuous frontage on a public or private way.

101. On May 14, 2018, at the Halifax Annual Town Meeting, a stack of leaflets appeared on the table used by the Town to place updated information for Town Meeting voters.

102. That leaflet disparaged Mr. Andrews' reputation.

103. At that Town Meeting, Mr. Seelig spoke on the Board's behalf on Article 55 which proposed to delete ZBL section 167-7.D(2)(a).

104. Mr. Seelig stated that section 167-7.D(2)(a) requires each building to be on a separate lot, and "the proposal from the Board of Selectmen is to in fact to eliminate the requirement of having individual lots for each building."

105. Town Meeting voters defeated Article 55, and section 167-7.D(2)(a) remained in the ZBL.

106. In or around 2018, the Trust's principals sold 17.5 acres of land ("17.5 Acre Parcel") for $1,000 to Naja Nessralla, the adult son of ZBA member Defendant Kozhaya Nessralla,

107. The real estate transaction described in the preceding paragraph was a *quid pro quo* for Nessralla's vote to deny Mr. Andrews the relief he requested from the ZBA.

108. The 17.5 Acre Parcel is land-locked, but abuts to the rear the property 69 Summit Street.

109. Defendant Kozhaya Nessralla and his adult son, Naja, reside at 69 Summit Street.

110. 69 Summit Street has frontage on Summit Street.

111. 69 Summit Street could be merged with the 17.5 Acre Parcel, allowing access for the formerly land locked parcel.

112. Allowing access to the 17.5 Acre Parcel would allow development of a lucrative multi-family project—just like the one the Trust is proposing at the Site.

113.     In 2018, the Land Court remanded the matter to the ZBA and ordered the ZBA to explain its 2017 Decision.

114.     During the ZBA proceedings that followed ("The Remand Proceedings"), the ZBA held an executive session with its new counsel, attorney Saillant.

115.     The ZBA thereafter met in open session and voted that neither the Planning Board's 2014 Site Plan Approval nor the ZBA's 2015 Special Permit required subdivision of the Site.

116.     Attorney Saillant authored the ZBA's "decision on remand" ("Remand Decision"), which purported to make numerous findings of fact.

117.     The ZBA had not made, or even discussed, any of the "findings of fact" that its decision reflected during the Remand Proceedings.

118.     The Remand Decision was an attempt to justify the ZBA's "interpretation" of the ZBL, and its denial of Mr. Andrews' requests for relief.

119.     The ZBA acted in violation of the Open Meeting Law during the remand proceedings because any discussion of the justification for its "interpretation" of the ZBL and/or its denial of Mr. Andrews' requests for relief took place behind closed doors.

120.     Members of the ZBA acted in bad faith during the remand proceedings, in an attempt to buttress the Town's position in the Land Court litigation.

121.     On August 20, 2018, there was a Special Town Meeting at which Article 10 proposed to increase Mr. Seelig's salary by $14,566 to a total of $110,000.

122.     Mr. Andrews spoke against Article 10.

123.     Town Meeting voted to pass over Article 10 and Mr. Seelig did not receive his raise.

124.     Mr. Seelig has a personal animus against Mr. Andrews.

125.     On April 8, 2019, Mr. Andrews stated at a ZBA meeting that Defendants Tom Millias and Piccirilli were business partners.

126.     Mr. Andrews also stated that Mr. Millias had improperly acted on a matters involving his own property in 2013 and 2014 when he was the Building Inspector.

127.     On April 10, 2019, Mr. Andrews petitioned Defendant Seelig and Town Counsel attorney Larry Mayo to investigate Mr. Tom Millias and Mr. Piccirilli's business partnership and their self-dealing within the town of Halifax Building Department.

128.     Mr. Tom Millias and Mr. Piccirilli's harbor a personal animus against Mr. Andrews.

129.     The Land Court held a trial in May of 2019 on Mr. Andrews' appeal of the ZBA's 2017 Decision.

130.     Prior to trial, the Land Court issued an order in which it stated that the trial would be broken into two "phases."

131.     The Order indicated that Mr. Andrews could not present his evidence of bad faith by town officials until "Phase Two" of the trial, which would only occur if Mr. Andrews prevailed on Phase One.

132.     Pursuant to the Court's order, the "only issue" on which Mr. Andrews could present evidence was whether the Planning Board's 2014 Site Plan Approval and the ZBA's 2015 Special Permit required the Trust to subdivide the Site.

133.     After trial, the Court issued a decision dated July 1, 2019 ("July 1, 2019 Decision").

134.     The July 1, 2019 Decision held that Planning Board's 2014 Site Plan Approval and the ZBA's 2015 Special Permit did require the Trust to subdivide the Site.

135.     The July 1, 2019 Decision held that the ZBA had illegally issued the building permits because the Approved Plans depicted lots and the Trust had not created lots.

136.     The Court specifically found that the Trust's principals had known that the Planning Board's approval required the creation of the lots under the Subdivision Control Law.

137.     The Court remanded the matter to the ZBA with an order that it revoke the building permits for Amanda's Estates.

138.     Mr. Andrews therefore prevailed in Phase I of the trial.

139.     The Court issued further rulings, however, rejecting Mr. Andrews' requests to proceed with Phase II of the trial.

140.     The Court never permitted Mr. Andrews to offer his evidence of bad faith on the part of various town officials.

141.     The July 1, 2019 Decision failed to rule on the central issue in the case: the correct interpretation of the ZBL 167-7.D(2)(a) which states that each building in a

multifamily development shall be located on an individual lot with continuous frontage on a public or private way ("the Central Issue").

142.     Because the July 1, 2019 Decision failed to rule on the Central Issue, the Trust was free to return to the Planning Board and ZBA in an attempt to seek new approvals to continue development.

143.     In or around 2019, the ZBA considered a special permit application for another multifamily development proposal at 395 Plymouth Street ("395 Plymouth Street").

144.     During the proceedings referred to in the preceding paragraph, Defendant Piccirilli recused himself acknowledging his conflict of interest with respect to the interpretation of the multifamily development provisions of the ZBL.

145.     Defendant Tom Millias also recused himself from appointing an alternate Building Inspector, also acknowledging his conflict of interest.

146.     The Board appointed Chris Carmichael as special zoning enforcement officer after at the Board's July 23, 2019 meeting.

147.     Despite their specific acknowledgments of their conflict of interest regarding the ZBL's requirements for multi-family developments, Defendants Piccirilli Tom Millias continued at all relevant times in official matters relating to the Trust's multifamily development.

148.     Because the Court's July 1, 2019 Decision failed to rule on the Central Issue, Town Officials could continue to act in bad faith on the Trust's further efforts.

149.     After the Court issued the July 1, 2019 Decision, the Trust sought and received multiple stays and continuance from the Court.

150.     In fact, the Trust spent 13 months attempting to secure approvals to continue development of its proposed 12 unit multi-family development on the Site which abuts Mr. Andrews' single family home.

151.     First, the Trust sought to amend its 2015 Special Permit by incorporating a new set of plans that depicted the parcel as a single large lot.

152.     On August 14, 2019, The Trust filed a request for a "waiver" of ZBL § 167-7(D)(2)(a) from the Halifax Planning Board.

153.      New land use counsel attorney Amy Kwesell opined that the Planning Board
lacked authority to "waive" a substantive provision of the ZBL, and that only the ZBA
could grant a variance.

154.      On October 17, 2019, the Trust filed Petition #910 with the ZBA, seeking to
modify its 2015 Special Permit by deleting reference to Approved Plans (depicting 6
duplexes, each on an individual "lots") and substituting a new plan set dated September
18, 2019 ("New Plans") (depicting the parcel as a single large lot with six duplexes
located thereon).

155.      After hearing on November 4, 2019, the ZBA denied the request for a
modification.

156.      The vote described in the preceding paragraph was three members in favor of
approving the modification and two opposed, which did not reach the super majority
counsel opined was required.

157.      The ZBA's issued a written decision on November 20, 2019 in which each ZBA
member stated in writing the justification for their vote.

158.      The ZBA members who voted in opposition to Trust's proposed modification
stated that the New Plans failed to comply with 167-7(D)(2)(a), which was the Central
Issue in the litigation.

159.      The ZBA members who voted in favor of the Trust's request did so in bad faith,
for personal financial reasons, based on business relationships with the Trust's principals,
and/or out of personal animus against Mr. Andrews.

160.      The Trust did not appeal the ZBA's November 2019 decision.

161.      The Trust then had another new plan set created ("Second New Plans").

162.      The Second New Plans, dated November 6, 2019, depicted the parcel divided into
four "lots;" two of the "lots" had a single duplex located thereon; the other two "lots"
each had two duplexes located thereon which were connected by a structure.

163.      Counsel Kwesell opined that the connecting structure rendered each set of two
duplexes a single "building" comprised of four residential units.

164.      The Trust submitted the Second New Plans to the Planning Board seeking a
modification of its 2014 site plan approval.

165.     Mr. Andrews objected to the Trust's petition after the Trust stated in an open meeting that it would not actually create the "lots" that its Second New Plans depicted.

166.     "Amanda's Way" was depicted on the Second New Plans as proving the frontage required by the ZBL for each of the "lots."

167.     The Trust stated that it would not take any steps to create "Amanda's Way" as a private way beyond simply constructing it.

168.     After hearing, by decision dated December 11, 2019, the Planning Board approved the modified plans by a vote of two members in favor and one opposed.

169.     The member opposed was Amy Troup.

170.     The Planning Board's decision was explicitly conditioned on the development meeting the Aquifer Protection requirements of ZBL 167-17.

171.     The Planning Board member who voted against the Trust's petition, Amy Troup, was later bullied by the Defendant Town Administrator Seelig and other Town officials, and was also stymied in performing her official duties in retaliation for her vote.

172.     The Trust filed Petition #915 with the ZBA seeking a modification of its special permit based on the Second New Plans.

173.     The ZBA opened a public hearing on January 13, 2020 on Petition #915.

174.     Mr. Andrews requested that Defendant Nessralla recuse himself due to his business relationship with the Trust's principals.

175.     Defendant Nessralla refused to recuse himself.

176.     Prior to the meeting, attorney Kwesell had advised in writing that, since the ZBA had acted unfavorably on the modification request in November of 2019, the ZBA should refer the petition to the Planning Board pursuant to § 167-22, which provides in relevant part:

> 167-22 Reconsideration of proposed changes.
> No appeal or petition for a variance under 167-21(A)(3) and no application for a special permit under 167-21(A)(2) which has been unfavorably acted upon by the Board of Appeals shall be considered on its merits by said Board within two (2) years after the vote of such unfavorable action, except with the unanimous consent of the Planning Board

177.     The ZBA continued its hearing to February 20, 2020.

178.     Peter Parcillin, the ZBA member who had voted against the Trust's previous applications on the basis of the requirements of 167-7.D(2)(a) had already indicated he could not attend a meeting on February 20, 2020, as it was school vacation week and he would be away.

179.     At the February 20, 2020 hearing, Mr. Andrews again requested that Defendant Nessralla recuse himself due to his business relationship with the Trust's principals.

180.     Mr. Nessralla again refused.

181.     Attorney Kwesell again opined that the ZBA should refer the matter to the Planning Board for a vote pursuant to §167-22.

182.     The minutes reflect that ZBA member Defendant Nessralla made the following motion: "That under Section 14, the [Zoning] Board has the power to allow them [*sic*] to accept the modification to the special permit under Petition #915 with a Unanimous voice vote of 'Yes' from all five (5) [ZBA] members present".

183.     The ZBA then voted to approve the Trust's petition for modification of its special permit by a vote of four members in favor and one opposed: "Motioned By Gerald Joy, Seconded by Kozhaya Nessrella, to accept/approve Petition #915 on the Party Trust's request that the Zoning Board of Appeals modify the 2015 special permit by deleting reference to prior plan set and adopt the 11/6/2019 Webby Plans under 167-7(D)(2)(a) with a Voice Vote four (4) 'YES' Borsari, Joy, Gaynor and Nessralla, and one (1) NO from Durgin)."

184.     Had the Chair scheduled the meeting at a time when ZBA member Peter Parcillin could be present, the likely result was that the Trust would not have received the four favorable votes it needed for its petition to pass.

185.     Mr. Andrews timely appealed the ZBA's decision by filing a Complaint in the Superior Court.

186.     The Trust then sought assignment of the matter to the Land Court judge that had failed to issue a decision on the Central Issue and prohibited Mr. Andrews from offering his evidence of bad faith of Town officials.

187.     Over Mr. Andrews' objection, the case was reassigned to the Land Court judge.

188.     After Mr. Andrews filed the Superior Court Complaint, by decision dated May 4, 2020, the ZBA found, as did the Planning Board in December of 2019, that the Trust

needed a special permit under 167-17 due to the Site's locating in the Aquifer Protection District.

189.     The Trust filed an application for the § 167-17 permit with the Planning Board.

190.     The Town Administrator and other Town officials refused the attempts of two Planning Board members, Amy Troup and Ashley DeSesa, from accessing public records concerning matters that were before the Planning Board.

191.     The actions referenced in the preceding paragraph were taken in retaliation for Ms. Troup's and Ms. DeSesa's faithful interpretation of the ZBL's provisions.

192.     On June 18, 2020, the Planning Board denied approval of the Trust's application for a special permit, citing 167-17(f)(16), which prohibits any use in the aquifer protection district other than single family use if the septic system is designed to process over 1500 gallons per day, since it was undisputed that the Trust's system exceed that by more than double.

193.     The Trust then sought and received yet another stay of the Court's Order and Judgment.

194.     On or about April 8, 2020, Mr. Andrews petitioned the Defendant Picirilli as and the ZBA for revocation of the modified building permits issued to the Trust.

195.     At the August 10, 2020 ZBA meeting, Defendant Nessralla again refused to recuse himself from the matter.

196.     The ZBA refused to acknowledge any of Mr. Andrews's arguments set forth in his petitions, and again voted in favor of the Trust.

197.     The Land Court's refusal to allow Mr. Andrews to offer evidence of the bad faith of town officials and the Court's failure to rule on the Central Issue in the case constitute special circumstances that rendered the remedies provided in G.L. c. 40A, which Mr. Andrews has pursued for over three years, unavailable to correct the wrongs committed by the Defendants and other town officials.

198.     Mr. Andrews has suffered damage to his home from the Trust's construction, as well as damage to his quiet enjoyment of his property.

199.     Mr. Andrews has also suffered damage to his mental health from the corrupt actions of officials of the Town he has lived in his entire life.

## Count I
## G.L. c. 12, section 11H, Violation of Article 10 of the Declaration of Rights of the
## Massachusetts Constitution
(The Town and Thomas Millias, Robert Piccirilli, Kozhaya Nessralla, Charles Seelig,
Individually and in their capacities as Town Officials)

1. The Plaintiff repeats and re-alleges all allegations set forth above, and incorporates the same herein by reference.

2. Article 10 of the Declaration of Rights of the Massachusetts Constitution provides all residents with the right to equal protection and due process of law with respect to their enjoyment of life, liberty, and property.

3. By their actions described herein, the Town and its Officials deliberately and knowingly acted against their counsel's advice, flouting state and local law.

4. By their actions described herein, the Town and its Officials interfered with Mr. Andrews' right to the even handed and consistent enforcement of the Zoning By Law, and caused injury to his property and emotional damage to himself.

5. By their actions described herein, the interference with Mr. Andrews' rights was done by threats, intimidation, and/or coercion.

6. Specifically, by their actions, the Town and its Officials, as part of a scheme of harassment and intimidation, attempted to coerce the Plaintiff into forgoing his rights by use of government power for purposes of abuse and oppression.

7. By their actions, the Town and its Officials, harassed and attempted to intimidate other Town officials from exercising their duties in a proper manner.

8. As a result of these violations, Mr. Andrews has suffered damages, harm, humiliation, and extreme distress for which the Town and individual Defendants are liable.

## Count II
## 42 U.S.C. § 1983, Violation of the Fourteenth Amendment to the United States Constitution
(The Town and Thomas Millias, Robert Piccirilli, Kozhaya Nessralla, Charles Seelig,
Individually and in their Capacities as Town Officials)

1. The Plaintiff repeats and re-alleges all allegations set forth herein, and incorporates the same by reference.

2. The Fourteenth Amendment to the U.S. Constitution gives all citizens the right to equal protection and due process of law.

3. By their actions described herein, taken under color of state law, the Town and its

17

Officials—especially but without limitation, Thomas Millias, Robert Piccirilli, Kozhaya Nessralla, and Charles Seelig--violated Mr. Andrews' rights to equal protection and substantive due process of law.

4. By their actions described herein, taken under color of law, the Town and its Officials deliberately and knowingly acted against their counsel's advice flouting state and local law.

5. By their actions described herein, taken under color of law, the Town and its Officials infringed on Mr. Andrews' right to the even handed and consistent enforcement of the Zoning By Law causing injury to his property.

6. By their actions taken herein, the Town and its Officials gave the Trust more favorable treatment than similarly situated developers because of their connections to and relationships with Town officials.

7. By their actions described herein, taken under color of law, the Town and its Officials used government power for purposes of oppression of Mr. Andrews' rights.

8. By their actions described herein, taken under color of law, the Town and its Officials used government power for purposes of rewarding connected parties and to advance their own financial and personal interests.

9. By their actions described herein, taken under color of law, the Town and its Officials used government power in a manner that is legally irrational and not keyed to any legitimate governmental interest.

10. The Town and its Officials treated the Trust more favorably than similarly situated developers, acted with personal animus against Mr. Andrews, and/or stood to profit personally from their actions.

11. The Land Court's refusal to allow Mr. Andrews to offer evidence of the bad faith of town officials and the Court's failure to rule on the Central Issue in the case constitute special circumstances that rendered the remedy provided in G.L. c. 40A, which Mr. Andrews has pursued for over three years, useless and unavailable to correct the wrong inflicted.

12. Town Officials' violations described herein were done intentionally and/or taken with reckless indifference to Mr. Andrews' constitutional rights.

13. As a result of these violations, Mr. Andrews has suffered damages, harm, humiliation, and extreme distress for which the Town and individual Defendants are liable.

**Count III**
**42 U.S.C. § 1983, Violation of the First Amendment to the United States Constitution**
(The Town and Thomas Millias, Robert Piccirilli, Kozhaya Nessralla, Charles Seelig,
Individually and in their Capacities as Town Officials)

1. The Plaintiff repeats and re-alleges all allegations set forth above, and incorporates the same herein by reference.

2. The First Amendment to the U.S. Constitution recognizes the right of all citizens to the freedom of speech and to petition government officials for a redress of their grievances.

3. By their actions described herein, taken under color of state law, the Town and its Officials--including without limitation, Mr. Piccirilli, Mr. Tom Millias, Mr. Kozhaya Nessralla, and Mr. Charlie Seelig, violated Mr. Andrews' rights to freedom of speech and to petition the Government for a redress of his grievances and to be free from retaliation for his exercise of his rights.

4. These violations were done intentionally and/or taken with reckless indifference to Mr. Andrews constitutional rights.

5. As a result of these violations, Mr. Andrews, has suffered damages, harm humiliation, pain and distress for which the Defendants are liable.

## JURY TRIAL DEMANDED

The Plaintiff demands a trial by jury for all counts so triable.

WHEREFORE, the Plaintiff demands judgment against the Defendants and requests that this Honorable Court:

a) Find that the Defendants deprived Mr. Andrews of his federal and state constitutional rights;

b) Enter an award against the Town and Town officials for compensatory damages for the injuries Mr. Andrews suffered as the result of those deprivations;

c) Enter an award against Thomas Millias, Robert Piccirilli, Kozhaya Nessralla, and Charles Seelig, in their individual capacities for punitive damages and other damages pursuant to 42 U.S.C. § 1983 and the MCRA;

d) Award Mr. Andrews his reasonable attorneys' fees for violation of his constitutional rights; and

e) Grant such further and other relief as this Honorable Court deems just and proper.

Case 1:20-cv-11659-PBS   Document 1-1   Filed 09/08/20   Page 23 of 23

Respectfully submitted by
the Plaintiff through his counsel,

*Ginny S. Kremer*

---

Ginny S. Kremer, Esq. BBO#629147
Christopher Alphen, Esq.
Blatman Bobrowski & Haverty LLC
9 Damonmill Square Suite 4A4
Concord, MA 01742
(978) 371.2226
ginny@bbhlaw.net
Date:   August 13, 2020